UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
COLUMBIA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | No. 1:19-cr-00019 |
| v. | ) | |
| | ) | CHIEF JUDGE CRENSHAW |
| JAMES L. CRABB | ) | |

## PLEA AGREEMENT

The United States of America, through Donald Q. Cochran, United States Attorney for the

Middle District of Tennessee, and Assistant United States Attorney Sarah K. Bogni, and defendant,

JAMES L. CRABB, through defendant's counsel, Brent Horst, pursuant to Rule 11(c)(1)(B) of the

Federal Rules of Criminal Procedure, have entered into an agreement, the terms and conditions of

which are as follows:

### Charges in This Case

1.      Defendant acknowledges that he has been charged in the information in this case

with conspiracy to commit health care fraud in violation of Title 18, United States Code Section

1349, and forfeiture, in violation of 18 U.S.C. § 982(a)(7).

2.      Defendant has read the charge against him contained in the information, and that

charge has been fully explained to him by his attorney.  Defendant fully understands the nature

and elements of the crime with which he has been charged.

### Charge to Which Defendant is Pleading Guilty

3.      By this Plea Agreement, defendant agrees to enter a voluntary plea of guilty to the

information, charging conspiracy to commit health care fraud.  In addition, as further provided

below, defendant agrees to the entry of a forfeiture judgment.

4.    The parties understand and agree that the offense to which defendant will enter a plea of guilty carries the following maximum penalties: a term of ten years' imprisonment, a $250,000 fine, supervised release of 3 years, and a special assessment of $100. Defendant further understands that the Court must order restitution to the victims of the offense in an amount determined by the Court.

Defendant also understands that as a result of his offense, he is subject to forfeiture of property as alleged in the information.

### Acknowledgements and Waivers Regarding Plea of Guilty

### Nature of Plea Agreement

5.    This Plea Agreement is entirely voluntary and represents the entire agreement between the United States Attorney and defendant regarding defendant's criminal liability in case *United States v. James Luther Crabb*, 1:19-cr-00019.

6.    Defendant understands that by pleading guilty he surrenders certain trial rights, including the following:

a.    If defendant persisted in a plea of not guilty to the charge against him, he would have the right to a public and speedy trial. Defendant has a right to a jury trial, and the trial would be by a judge rather than a jury only if defendant, the government, and the Court all agreed to have no jury.

b.    If the trial were a jury trial, the jury would be composed of twelve laypersons selected at random. Defendant and his attorney would have a say in who the jurors would be by removing prospective jurors for cause, or without cause by exercising so-called peremptory challenges. The jury would have to agree unanimously before it could return a verdict

2

of either guilty or not guilty. The jury would be instructed that defendant is presumed innocent; that the government bears the burden of proving defendant guilty of the charge beyond a reasonable doubt; and that it must consider each count of the indictment against defendant separately.

       c.     If the trial were held by the judge without a jury, the judge would find the facts and determine, after hearing all the evidence, whether or not the judge was persuaded of defendant's guilt beyond a reasonable doubt.

       d.     At a trial, whether by a jury or a judge, the government would be required to present its witnesses and other evidence against defendant. Defendant would be able to confront those government witnesses and his attorney would be able to cross-examine them. In turn, defendant could present witnesses and other evidence on his own behalf. If the witnesses for defendant would not appear voluntarily, he could require their attendance through the subpoena power of the Court.

       e.     At a trial, defendant would have a privilege against self-incrimination so that he could testify or decline to testify, and no inference of guilt could be drawn from his refusal to testify.

       7.     Defendant understands that by pleading guilty he is waiving all of the trial rights set forth in the prior paragraph. Defendant's attorney has explained those rights to him, and the consequences of his waiver of those rights.

Factual Basis

       8.     Defendant will plead guilty because he is in fact guilty of the charge contained in the Information. In pleading guilty, defendant admits the following facts and that those facts establish his guilt beyond a reasonable doubt:

3

JAMES L. CRABB was a resident of Loretto, Lawrence County, Tennessee, in the Middle District of Tennessee, and a medical doctor licensed in the states of Tennessee and Mississippi. The defendant was a participating provider in the Medicare Program ("Medicare"), and as such, agreed to abide by the policies, procedures, rules, and regulations governing reimbursement.

<u>Background on Medicare and Durable Medical Equipment</u>

Medicare was a federal healthcare program that provided benefits to individuals who were sixty-five years of age or older, or disabled. The benefits available under Medicare were governed by federal statutes and regulations. The United States Department of Health and Human Services ("HHS"), through its agency the Center for Medicare and Medicaid Services ("CMS"), oversaw and administered Medicare. Individuals who received benefits under Medicare were commonly referred to as Medicare "beneficiaries."

Medicare was a "health care benefit program," as defined by Title 18, United States Code, Section 24(b) and a "Federal health care program" as defined in Title 42, United States Code, Section 1320a-7b.

Medicare was subdivided into multiple "parts." Medicare Part B covered physician services and outpatient care, including an individual's access to durable medical equipment ("DME"), such as orthotic devices. Orthotic devices were a type of DME that included rigid and semi-rigid devices, such as knee braces, back braces, shoulder brace, and wrist braces (collectively, "braces").

Medicare reimbursed DME companies and other healthcare providers for services and items rendered to beneficiaries. To receive payment from Medicare, providers submitted or caused the submission of claims to Medicare.

4

A claim for DME submitted to Medicare qualified for reimbursement only if the DME was medically necessary for the treatment of the beneficiary's illness or injury and prescribed by a licensed provider. Medicare also required that the provider prescribing the DME issue an order documenting the medical need for the DME, and, for certain categories of DME, conduct a face-to-face visit with the beneficiary. Crabb admits that he never conducted face-to-face visits with the Medicare beneficiaries for whom he ordered DME, and even where a face-to-face was not required, he admits that he often never spoke to a patient at all.

For DME, where a face-to-face visit is required, or a physician visit is billed to Medicare, it could occur via "telehealth" provided certain requirements were met, including (a) that the beneficiary was located in a rural or health professional shortage area; (b) that the services were delivered via an interactive telecommunications system, not simply by telephone or email; (c) that the beneficiary was at a practitioner's office or specified medical facility – not in the beneficiary's own home – during the telehealth medical consultation; (d) that the ordering provider be a physician or other qualified health professional; and (e) that the medical examination was under the provider's control. Crabb admits and stipulates that the telehealth services he provided did not meet the telehealth requirements.

### The Defendant's Conspiracy

It was the purpose of the conspiracy for JAMES L. CRABB and his co-conspirators, to unlawfully enrich themselves by, among other things: (a) submitting or causing the submission of false and fraudulent claims to Medicare for DME products or services that were not eligible for reimbursement, not provided as represented, and/or were medically unnecessary; (b) signing, or causing to be signed, doctors' orders and prescriptions for DME products or services, in exchange for kickbacks and bribes; (c) concealing the submission of false and fraudulent DME claims to

5

Medicare; and (d) diverting proceeds of the fraud for the personal use and benefit of JAMES L. CRABB and his co-conspirators and others, in the form of compensation and other remuneration, and to further the fraud.

The manner and means by which JAMES L. CRABB and his co-conspirators sought to accomplish the purpose of the conspiracy included, among other things, the following:

JAMES L. CRABB certified to Medicare that he would comply with all Medicare rules and regulations, and federal laws, including that he would refrain from violating the federal Anti-Kickback Statute, which prohibited the knowing and willful payment of "remuneration" to induce or reward patient referrals or the generation of business involving any item or service payable by Federal health care programs.

JAMES L. CRABB entered into express and implied agreements to sign orders and prescriptions for DME. The defendant obtained the orders and prescriptions to be signed for Medicare beneficiaries through Company 1, Company 2, and other companies and individuals. The defendant then signed the doctor's orders and prescriptions for DME regardless of medical necessity, in the absence of a pre-existing doctor patient relationship, without a physical examination, based solely on a brief telephonic conversation with the Medicare beneficiary or, frequently, without any conversation with the Medicare beneficiary. Defendant signed many of the orders and prescriptions from his home in Loretto, Tennessee, located in the Middle District of Tennessee.

JAMES L. CRABB and his co-conspirators concealed the fraud by creating fraudulent orders and prescriptions that made it appear as though Medicare beneficiaries needed and were receiving medically necessary medical care, services, or items. This concealment included creating orders and prescriptions with medical histories for patients that did not reflect actual patient

6

information and was never confirmed with the patient, because the defendant did not actually perform an examination of the patient or speak with the patient. In exchange for the signed doctor's orders and prescriptions, Company 1, Company 2, and others, paid JAMES L. CRABB on a per-prescription basis for each order or prescription he signed, regardless of medical necessity.

JAMES L. CRABB knew that DME prescriptions and orders that he signed for Medicare beneficiaries were medically unnecessary, not provided as represented, and otherwise not eligible for reimbursement because they were procured by the payment of kickbacks to the defendant.

JAMES L. CRABB also knew that brief telephonic phone calls with Medicare beneficiaries who were located in their homes in urban areas did not meet Medicare's telehealth requirements to prescribe certain categories of DME. He likewise knew, many of the phone calls never actually occurred.

Additionally, JAMES L. CRABB, at times, assigned the signing of his name on doctor orders and prescriptions to Individual 3, an unlicensed assistant with no medical training or background. He then paid Individual 3 cash for each prescription Individual 3 signed in the defendant's name, without verifying the medical necessity of the prescription or order.

JAMES L. CRABB, at times, signed or caused to be signed, doctor's orders and prescriptions for Medicare beneficiaries located in states where JAMES L. CRABB was not licensed. The defendant knew he had to be licensed in the state where he provided any services then billed to Medicare. The defendant signed prescriptions for patients in Hawaii and Indiana, where he was not licensed.

Defendant and his co-conspirators carried out this scheme, notwithstanding the fact that they were aware of Medicare rules and regulations, including the requirement that services and items be medically necessary, that services must be provided as represented in claims submitted

7

to Medicare, and that the payment of kickbacks in exchange for the referral of items or services is prohibited.

Defendant and his co-conspirators carried out this scheme in order to financially enrich themselves. Defendant received kickback payments from his co-conspirators, and marketing companies and/or purported telemedicine companies, including Company 1 and Company 2, of approximately $30 for each prescription or order signed by the defendant. Between in and around February 2015 and August, 2019, defendant was paid approximately $493,780 in kickback payments for prescriptions or orders signed by the defendant. The defendant also paid kickbacks to Individual 3, in exchange for Individual 3 signing prescriptions for DME in the defendant's name.

The conspiracy resulted in the submission of false and fraudulent claims to Medicare, in the amount of approximately $7,000,000, for DME that was medically unnecessary, not provided as represented, and/or was not eligible for reimbursement including because the doctor's orders and prescriptions were procured through the payment of kickbacks and bribes.

For example, on or about April 2017, JAMES L. CRABB signed DME prescriptions for Medicare Beneficiary D.B. D.B. lives in Lebanon, Tennessee, in the Middle District of Tennessee. In April 2017, a DME company submitted claims to Medicare Part B in the amount of $1,313.99, for a back brace prescribed by the defendant to D.B. Prior to the defendant signing a DME prescription for D.B., D.B. received a marketing phone call from a DME company about a back brace. D.B. then received a box containing back, knee, hand, and elbow braces, without ever talking to the defendant or seeing the defendant. D.B. never used the braces, and stored most of them in a storage shed, still in the plastic.

On or about May 2017, JAMES L. CRABB signed DME prescriptions for Medicare Beneficiary C.C. C.C. lives in Smyrna, Tennessee, in the Middle District of Tennessee. On or about May 2017, a DME company submitted claims to Medicare Part B in the amount of $2,769.29, for a back brace and a knee brace prescribed by the defendant to C.C. Prior to the defendant signing a DME prescription for C.C., C.C. responded to a marketing advertisement C.C. received in the mail that advertised C.C. might be eligible for back and knee braces through Medicare. C.C. called the number and received the braces without ever talking to the defendant or seeing the defendant.

On or about June 2017, JAMES L. CRABB signed DME prescriptions for Medicare Beneficiary B.R. B.R., lives in Old Hickory, Tennessee, in the Middle District of Tennessee. On or about June 2017, a DME company submitted a claim to Medicare Part B in the amount of $724.06, for a "shoulder elbow wrist hand" brace prescribed by the defendant to B.R. B.R. never met the defendant, and did not ever recall ever speaking to the defendant. B.R. did not know why B.R. was prescribed a DME brace by the defendant.

With respect to the information, from in or around February 2015 and continuing through in or around August 2019, in the Middle District of Tennessee, and elsewhere, JAMES L. CRABB, did willfully and knowingly combine, conspire, confederate, and agree with Individual 1, Individual 2, Individual 3, and others known and unknown to the United States Attorney, to commit certain offenses against the United States, that is, to knowingly and willfully execute a scheme and artifice to defraud a health care benefit program affecting commerce, as defined by Title 18, United States Code, Section 24(b), that is, Medicare, and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of, said healthcare benefit program, in connection with the delivery

9

of and payment for healthcare benefits, items, and services, in violation of Title 18, United States Code, Section 1347.

This statement of facts is provided to assist the Court in determining whether a factual basis exists for defendant's plea of guilty and criminal forfeiture and to assess relevant conduct for purposes of the United States Sentencing Guidelines. The statement of facts does not contain each and every fact known to defendant and to the United States concerning defendant's and/or others' involvement in the offense conduct and other matters.

<u>Sentencing Guidelines Calculations</u>

9. The parties understand that the Court will take account of the United States Sentencing Guidelines (hereinafter "U.S.S.G."), together with the other sentencing factors set forth at 18 U.S.C. § 3553(a), and will consider the U.S.S.G. advisory sentencing range in imposing defendant's sentence. The parties agree that the U.S.S.G. to be considered in this case are those effective November 1, 2018.

10. For purposes of determining the U.S.S.G. advisory sentencing range, the United States and defendant agree to recommend to the Court, pursuant to Rule 11(c)(1)(B), the following:

    a.    Offense Level Calculations.

    i.    The base offense level for the count of conviction and relevant conduct is 6, pursuant to U.S.S.G. § 2B1.1(a).

    ii.    The base offense level for the first count of conviction and relevant conduct is increased by 16, pursuant to U.S.S.G. § 2B1.1(b)(1)(I), because the loss is greater than $1,500,000, but less than $3,500,000.

10

iii.     The base offense level for the first count of conviction and relevant conduct is increased by 2, pursuant to U.S.S.G. § 2B1.1(b)(7), because the loss to healthcare benefit program is more than $1 million.

iv.     The base offense level for the first count of conviction and relevant conduct is increased by 2, pursuant to U.S.S.G. § 2B1.1(b)(10), because the offense involved sophisticated means.

v.     The base offense level for the first count of conviction and relevant conduct is increased by 2, pursuant to U.S.S.G. § 3B1.3, because the defendant abused a position of public or private trust and/or used a special skill.

vi.     Assuming defendant clearly demonstrates acceptance of responsibility, to the satisfaction of the government, through his allocution and subsequent conduct prior to the imposition of sentence, a 2-level reduction will be warranted, pursuant to U.S.S.G. § 3E1.1(a). Furthermore, assuming defendant accepts responsibility as described in the previous sentence, the United States will move for an additional one-level reduction pursuant to U.S.S.G § 3E1.1(b), because defendant will have given timely notice of his intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the government and the Court to allocate their resources efficiently.

vii.     The parties agree that no additional upward or downward adjustments, or U.S.S.G.-based departures, are appropriate.

b.     Criminal History Category. The parties have no agreement about the defendant's criminal history, but the parties anticipate that defendant's criminal history will be Criminal History Category I.

11

c. Recommended Offense Level: Therefore, the parties agree to recommend to the Court a final offense level of 25 (the "Recommended Offense Level"). Defendant understands that the offense level as ultimately determined by the Court (the "court-determined offense level") may be different from the Recommended Offense Level. Defendant likewise understands that the guidelines range as ultimately determined by the Court (the "court-determined guidelines range") may be based on an offense level different from the Recommended Offense Level.

d. Defendant is aware that the Recommended Offense Level is a prediction, not a promise, and is not binding on the Probation Office or the Court. Defendant understands that the Probation Office will conduct its own investigation and make its own recommendations, that the Court ultimately determines the facts and law relevant to sentencing, that the Court's determinations govern the final guidelines calculations, and that the Court determines both the final offense level and the final guidelines range. Accordingly, the validity of this agreement is not contingent upon the Probation Officer's or the Court's concurrence with the above calculations. In the event that the Probation Office or the Court contemplates any U.S.S.G. adjustments, departures, or calculations different from those recommended above, the parties reserve the right to answer any inquiries and to make all appropriate arguments concerning the same. Defendant further acknowledges that if the Court does not accept the U.S.S.G. recommendations of the parties, defendant will have no right to withdraw his guilty plea.

Agreements Relating to Sentencing

11. Each party is free to recommend whatever sentence it deems appropriate.

12. It is understood by the parties that the Court is neither a party to nor bound by this Plea Agreement and, after consideration of the U.S.S.G., may impose the maximum penalties as set forth above. Defendant further acknowledges that if the Court does not accept the sentencing

12

recommendation of the parties, defendant will have no right to withdraw his guilty plea. Similarly, defendant understands that any recommendation by the Court related to location of imprisonment is not binding on the Bureau of Prisons.

13.     Regarding restitution, the parties acknowledge that the amount of restitution owed to Medicare is $3,493,576, and that pursuant to Title 18, United States Code, Section 3663A, the Court must order defendant to make restitution in this amount, minus any credit for funds repaid prior to sentencing. Unless the Court orders otherwise, restitution shall be due immediately.

14.     Defendant agrees to pay the special assessment of $100 at the time of sentencing to the Clerk of the U.S. District Court.

Surrender of Medical License

15.     Defendant agrees to surrender his license to practice medicine in any state in which he is licensed within thirty (30) days of executing this agreement, and agrees not to reapply in the future.

16.     Defendant agrees that, if ordered by the United States Probation and Pretrial Services Office (U.S.P.O.) as a condition of release, he will not practice medicine while on pre-trial release.

17.     Violation of this provision constitutes a breach of the plea agreement. Defendant agrees, in the event of such breach, to waive the statute of limitations, and allows the factual basis in the plea agreement to be used against the defendant to prove criminal charges.

Forfeiture in the Form of a $493,780 Money Judgment

18.     The forfeiture allegation of the information put the defendant on notice that upon conviction of the charges contained within the information, defendant shall forfeit to the United States any property, real or personal, which constitutes or is derived from proceeds traceable to a violation

13

of 18 U.S.C. § 1347 or a conspiracy to commit such offense, including but not limited to a money judgment in an amount representing the amount of proceeds. By entry of a guilty plea to the information, defendant acknowledges that the property identified above is subject to forfeiture and that he has had an opportunity to be heard on this matter.

19.     Defendant agrees that the amount of proceeds of the offense of conviction as alleged in the information is $493,780. This dollar value represents the value of funds paid pursuant to false and fraudulent claims the defendant caused to be paid by Medicare based on the defendant's signed prescriptions or orders for medically unnecessary DME to Medicare beneficiaries.

20.     Defendant agrees to the entry of an Order of Forfeiture consisting of a Money Judgment in the amount of $493,780 in that this property is subject to forfeiture as proceeds traceable to a conspiracy to commit a violation of 18 U.S.C. § 1347 in violation of 18 U.S.C. § 1349.

21.     Defendant and the United States agree that every effort will be made to credit any payment toward forfeiture against both the Order of Forfeiture and any restitution order via the remission and restoration process. However, the parties acknowledge that the ultimate discretion lies with the Money Laundering and Asset Recovery Section of the U.S. Department of Justice regarding whether to grant or deny any request related to the remission or restoration process.

22.     Defendant will cooperate and assist the United States in its efforts to recover the proceeds of the crime.

23.     Defendant understands that—with the exception of potential restitution credit as set forth above—forfeiture of this property shall not be treated as satisfaction of any fine, cost of imprisonment, or any other penalty the Court may impose upon defendant in addition to the Order

14

of Forfeiture.

24. Defendant acknowledges that as a result of his act or omission, the proceeds of his crime of conviction which are subject to forfeiture:

      a.      cannot be located upon exercise of due diligence;

      b.      has been transferred or sold to, or deposited with, a third party;

      c.      has been placed beyond the jurisdiction of the Court;

      d.      has been substantially diminished in value; or

      e.      has been commingled with other property, which cannot be divided without difficulty

and as a result, pursuant to 21 U.S.C. § 853(p), the United States is entitled to forfeiture of substitute property up to the value of $493,780 in proceeds.

25. Defendant further acknowledges that the United States is entitled to forfeiture of substitute property in the amount of the proceeds of the crime (specifically $493,780) and therefore agrees to the forfeiture of substitute assets and entry of an order allowing the United States to conduct any discovery proper in identifying, locating or disposing of the property subject to forfeiture, including depositions, interrogatories, requests for production of documents and the issuance of subpoenas, without further application to the Court and to facilitate the identification and location of property declared forfeited, substitute assets, and to facilitate the disposition of any petitions for remission, mitigation or restoration. The substitute property recovered shall not exceed in total $493,780 United States currency.

26. Defendant further agrees to cooperate fully and to execute any supplementary documents, including authorizing the United States to obtain Defendant's credit report, and to take any additional actions that may be necessary or appropriate to effect this agreement as to forfeiture, restitution, and substitute assets.

15

27.    Defendant further authorizes the United States Probation and Pretrial Services Office (U.S.P.O.) to release the Presentence Investigative Report and all financial documents pertaining to Defendant to the Asset Forfeiture Unit of the United States Attorney's Office ("AF Unit") for the Middle District of Tennessee.

28.    Defendant further authorizes the release to the AF Unit of his financial statement submitted to the Court in his application for pro bono attorney.

29.    Defendant further authorizes the Internal Revenue Service to Release his tax returns for the years beginning 2017 through the pendency of the payment of the full amount of the Order of Forfeiture.

30.    Defendant agrees to waive all appellate rights concerning the entry of the money judgment and all matters related thereto.

<u>Presentence Investigation Report/Post-Sentence Supervision</u>

31.    Defendant understands that the United States Attorney's Office, in its submission to the Probation Office as part of the Pre-Sentence Report and at sentencing, shall fully apprise the District Court and the United States Probation Office of the nature, scope, and extent of defendant's conduct regarding the charges against him, as well as any related matters. The government will make known all matters in aggravation and mitigation relevant to the issue of sentencing.

32.    Defendant agrees to execute truthfully and completely a Financial Statement (with supporting documentation) prior to sentencing, to be provided to and shared among the Court, the United States Probation Office, and the United States Attorney's Office regarding all details of his financial circumstances, including his recent income tax returns as specified by the Probation Officer. Defendant understands that providing false or incomplete information, or refusing to provide this information, may be used as a basis for denial of a reduction for acceptance of

16

responsibility pursuant to U.S.S.G. § 3E1.1 and enhancement of his sentence for obstruction of justice under U.S.S.G. § 3C1.1, and may be prosecuted as a violation of Title 18, United States Code, Section 1001, or as a contempt of the Court.

33.     This Plea Agreement concerns criminal liability only. Except as expressly set forth in this Plea Agreement, nothing herein shall constitute a limitation, waiver, or release by the United States or any of its agencies of any administrative or judicial civil claim, demand, or cause of action it may have against defendant or any other person or entity. The obligations of this Plea Agreement are limited to the United States Attorney's Office for the Middle District of Tennessee and cannot bind any other federal, state, or local prosecuting, administrative, or regulatory authorities, except as expressly set forth in this Plea Agreement.

34.     Defendant understands that nothing in this Plea Agreement shall limit the Internal Revenue Service (IRS) in its collection of any taxes, interest, or penalties from defendant.

### Entry of Guilty Plea

35.     The parties jointly request that the Court accept the defendant's plea of guilty as set forth in this agreement and enter an order reflecting the acceptance of the plea while reserving acceptance of this plea agreement until receipt of the pre-sentence report and sentencing.

### Waiver of Appellate Rights

36.     Regarding the issue of guilt, defendant hereby waives all (i) rights to appeal any issue bearing on the determination of whether he is guilty of the crime(s) to which he is agreeing to plead guilty; and (ii) trial rights that might have been available if he exercised his right to go to trial. Regarding sentencing, defendant is aware that 18 U.S.C. § 3742 generally affords a defendant the right to appeal the sentence imposed. Acknowledging this, defendant knowingly waives the right to appeal any sentence within or below the Recommended Guidelines Range. Defendant further

17

waives all appellate rights and all collateral attacks concerning forfeiture and all matters related thereto. Defendant also knowingly waives the right to challenge the sentence imposed in any motion pursuant to 18 U.S.C. § 3582(c)(2) and in any collateral attack, including, but not limited to, a motion brought pursuant to 28 U.S.C. § 2255 and/or § 2241. However, no waiver of the right to appeal, or to challenge the adjudication of guilt or the sentence imposed in any collateral attack, shall apply to a claim of involuntariness, prosecutorial misconduct, or ineffective assistance of counsel. Likewise, the government waives the right to appeal any sentence: (i) within or above the Recommended Guidelines Range; or (ii) below such guideline range if the government has moved for a downward departure pursuant to U.S.S.G. §5K1.1.

Other Terms

37.     Defendant agrees to cooperate with the United States Attorney's Office in collecting any unpaid fine and restitution for which defendant is liable, including providing financial statements and supporting records as requested by the United States Attorney's Office. Defendant further agrees that any monetary penalties imposed by the Court will be subject to immediate enforcement as provided for in 18 U.S.C. § 3613, and submitted to the Treasury Offset Programs so that any federal payment or transfer of returned property the defendant receives may be offset and applied to federal debts but will not affect the periodic payment schedule.

38.     Defendant agrees to cooperate with the IRS in any tax examination or audit of defendant that directly or indirectly relates to or arises out of the course of conduct defendant has acknowledged in this Plea Agreement, by transmitting to the IRS original records or copies thereof, and any additional books and records that the IRS may request. Nothing in this paragraph precludes

defendant from asserting any legal or factual defense to taxes, interest, and penalties that may be assessed by the IRS.

39.     Should defendant engage in additional criminal activity after he has pled guilty but prior to sentencing, defendant shall be considered to have breached this Plea Agreement, and the government at its option may void this Plea Agreement.

Conclusion

40.     Defendant understands that the information and this Plea Agreement have been or will be filed with the Court, will become matters of public record, and may be disclosed to any person.

41.     Defendant understands that his compliance with each part of this Plea Agreement extends until such time as he is sentenced, and failure to abide by any term of the Plea Agreement is a violation of the Plea Agreement. Defendant further understands that in the event he violates this Plea Agreement, the government, at its option, may move to vacate the Plea Agreement, rendering it null and void, and thereafter prosecute defendant not subject to any of the limits set forth in this Plea Agreement, or may require defendant's specific performance of this Plea Agreement. Defendant understands and agrees that in the event that the Court permits defendant to withdraw from this Plea Agreement, or defendant breaches any of its terms and the government elects to void the Plea Agreement and prosecute defendant, any prosecutions that are not time-barred by the applicable statute of limitations on the date of the signing of this Plea Agreement may be commenced against defendant in accordance with this paragraph, notwithstanding the expiration of the statute of limitations between the signing of this Plea Agreement and the commencement of such prosecutions.

19

42.     Defendant and his attorney acknowledge that no threats have been made to cause defendant to plead guilty.

43.     No promises, agreements, or conditions have been entered into other than those set forth in this Plea Agreement, and none will be entered into unless memorialized in writing and signed by all of the parties listed below.

44.     <u>Defendant's Signature:</u>  I hereby agree that I have consulted with my attorney and fully understand all rights with respect to the pending information. Further, I fully understand all rights with respect to the provisions of the Sentencing Guidelines that may apply in my case. I have read this Plea Agreement and carefully reviewed every part of it with my attorney. I understand this Plea Agreement, and I voluntarily agree to it.

Date:  02/28/20          _____
                         JAMES LUTHER CRABB, MD
                         Defendant

20

45. <u>Defense Counsel Signature:</u> I am counsel for defendant in this case. I have fully explained to defendant his rights with respect to the pending information. Further, I have reviewed the provisions of the Sentencing Guidelines and Policy Statements, and I have fully explained to defendant the provisions of those guidelines that may apply in this case. I have reviewed carefully every part of this Plea Agreement with defendant. To my knowledge, defendant's decision to enter into this Plea Agreement is an informed and voluntary one.

Date: 2-28-20

BRENT HORST
Attorney for Defendant

Respectfully submitted,

DONALD Q. COCHRAN
United States Attorney

SARAH K. BOGNI
Assistant U.S. Attorney

STEPHANIE N. TOUSSAINT
Deputy Criminal Chief

21